# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs December 4, 2001

## STATE OF TENNESSEE v. BEN MILLS

### Appeal from the Criminal Court for Shelby County
### Nos. 95-06195, 95-06196, 95-06198, 95-061200     John P. Colton, Judge

### No. W1999-01175-CCA-R3-CD  - Filed May 3, 2002

The defendant, Ben Mills, was convicted of one count of first degree premeditated murder, one count of felony murder, one count of aggravated robbery and two counts of attempted first degree murder. The trial court merged the murder convictions and imposed a sentence of life imprisonment.[1]  For the remaining convictions, the trial court imposed sentences as follows: eight years as a standard, Range I offender for aggravated robbery to be served concurrently with the life sentence, and 15 years as a standard, Range I offender for each attempted first degree murder conviction to be served concurrently to each other but consecutively to the sentences for first degree murder and aggravated robbery.  The effective sentence, therefore, is life plus 15 years.  In this appeal as of right, the defendant contends (1) that the evidence was insufficient to support his convictions; (2) that the trial court erred by failing to instruct the jury regarding all of the lesser included offenses of felony murder; and (3) that the trial court erred by failing to instruct the jury on intoxication.  The judgments of the trial court are affirmed.  The judgment for first degree murder is modified to reflect that the conviction for felony murder is merged into the conviction for premeditated first degree murder.

### Tenn. R. App. P. 3; Judgments of the Trial Court Affirmed as Modified

GARY R. WADE, P.J., delivered the opinion of the court, in which DAVID H. WELLES and DAVID G. HAYES, JJ., joined.

Mike Roberts, Memphis, Tennessee (at trial), and Marty B. McAfee, Memphis, Tennessee (on appeal), for the appellant, Ben Mills.

Paul G. Summers, Attorney General & Reporter; P. Robin Dixon, Jr., Assistant Attorney General; Dan Woody and Thomas Hoover, Assistant District Attorneys General, for the appellee, the State of Tennessee.

---

[1] Because the state did not seek the death penalty or life without parole, a life sentence was automatic after a conviction for first degree murder.  See Tenn. Code Ann. § 39-13-208(b)-(c) (Supp. 1994).

**OPINION**

At approximately 2:00 A.M. on April 12, 1995, Officer Robert G. Moore of the Memphis Police Department, a crime scene specialist, responded to a call that a shooting had occurred at a residence on Breedlove Street. While en route, Officer Moore obtained a description of the suspects and the vehicle they were driving. When he observed a vehicle matching the description, Officer Moore followed it onto a side street. The vehicle stopped and Officer Moore ordered the driver to the ground. Two additional suspects remained in the car until other officers arrived to assist.

Officer Moore and another officer took photographs, prepared a sketch of the crime scene, and collected potential evidence, including three bullet fragments. None of the fragments were matched to a particular gun. While only three fragments were recovered from the apartment, there were eleven bullet impacts in all. Many bullet fragments were not recovered because, according to Officer Moore, their recovery would have caused extensive damage to the walls of the apartment. There was blood on the front door and on the front steps of the apartment. It was Officer Moore's opinion that shots had been fired from both ends of the apartment.

On the morning of the shooting, Aaron Cobb, a first cousin of shooting victim Kenneth Allen, and Demetrius Manning attended a party at the residence of Carl and Barbara "Beanie" Turner at 1122 Breedlove. At trial, Cobb testified that when he arrived at approximately 1:45 A.M., the victim, Dedrick Adams, and Taurus Cooper were playing dominoes and shooting dice. Cobb stated that neither he nor Manning possessed a weapon. Shortly thereafter, the defendant and his co-defendant, Ashley Nesbitt, knocked on the front door and asked to come inside. When no one opened the door, the defendant and Nesbitt, according to Cobb, "busted in" the front door, sat down on the couch, and asked if anyone was "straight," which was tantamount to asking if anyone had drugs. When those present responded in the negative, the defendant stood up as if to leave, then spun around, drew a pistol, and ordered everyone to "drop it off." At the same time, Nesbitt stood up and drew his gun. Cobb testified that "drop it off" meant that they should place their money and valuables onto the floor. As valuables were being placed on the floor, Nesbitt and the defendant began to shoot. Cobb stated that when the shooting began he ran out the back door and around the corner of the building. As he ran, he observed someone sitting in the driver's seat of an older model, gray Buick LeSabre holding a weapon. Cobb then saw the defendant and Nesbitt enter the LeSabre as it was driven away. When he returned to the apartment, Cobb saw Carl Turner holding the victim. Later, the victim died as a result of a gunshot wound. Cobb recalled that when he identified the defendant and Nesbitt at the police station later that evening, they were wearing different clothes. Cobb reiterated that the defendant and Nesbitt were the only individuals in the apartment who possessed guns that evening.

Taurus Cooper testified that for several hours before the shooting, he played dominoes, shot dice, and gambled with the victim, Carl Turner, Aaron "Chubby" Cobb, Demetrius "Metrie" Manning, Dedrick Adams, and James Green. Carl Turner's wife Barbara was asleep in the back room. He recalled that there was a knock at the door and someone shouted, "Open the door." He claimed that when no one opened the door, the defendant and Nesbitt "came through" the door,

uninvited. Shortly thereafter, the defendant walked toward the front door as if to leave and then spun around, pointed a gun at them, and fired a shot into the ceiling. Cooper recalled that the defendant demanded that they "drop the money off" and Nesbitt said, "Well, you all heard him, and you all drop the money off." After the money and other valuables were placed on the floor, the defendant and Nesbitt began shooting. As others ran outside, Cooper hid behind the opened door. According to Cooper, he noticed that both the defendant and Nesbitt had changed clothes before he identified them at the police station.

Demetrius Manning corroborated the testimony offered by Cobb and Cooper. After the shooting began, Manning opened a back bedroom window and was about to jump out when the gunfire stopped. When he returned to the living room, he saw the victim bleeding on the floor. At that point, Nesbitt fired several shots in his direction and Manning ran back into the bedroom and jumped out the window. Manning recalled that Nesbitt wore white jeans during the shooting but was wearing purple when Manning saw him at the police station.

Barbara Turner, whose nickname was "Beanie," testified that on the morning of the shooting, her husband awoke her and directed her into the closet. While in the closet, she heard gunfire. After the shooting stopped, she walked into the hallway and saw the victim lying on the floor in a pool of blood. A young man she described as having bushy hair (other proof established that Nesbitt wore an Afro-type hair style at the time of the shooting) was stooped over the victim, picking money up off of the floor. After seeing the man, Ms. Turner locked herself in the bathroom for approximately five minutes. While in the bathroom, she heard tires squeal outside. Ms. Turner related that neither her husband nor Dedrick Adams owned a weapon.

Carl Turner confirmed that on the morning of the shooting, the defendant and Nesbitt first asked for drugs and then demanded money at gunpoint. He testified that the defendant, who had come to the Turner's apartment the night before asking to purchase drugs, appeared to be under the influence of cocaine. Both men were armed. When the defendant fired a shot into the ceiling, Turner ran into his bedroom and jumped out the window. While outside, he noticed a young man sitting in a parked car. After remaining hidden for several minutes, Turner returned to the apartment and saw the victim lying on the kitchen floor. During cross-examination, Turner acknowledged that he had originally told defense investigators that a man he knew as Sean, who was also known as "Four-Four" and was present at the time of the shooting, had a .44 Magnum which he fired at Nesbitt when the shooting broke out. He conceded however, that he had not seen the weapon but was told by an individual he could only identify as "Nausea" that Sean had fired a gun during the robbery.

Renwick Cowans, an officer with the Memphis Police Department Organized Crime Unit, assisted Officer Moore in the arrest. He testified that money was recovered from both the defendant and Nesbitt. He did not find guns in their possession.

Medical testimony established that the victim died as a result of a gunshot wound which penetrated the lung. The bullet entered just under the armpit and did not exit. Two bullet fragments were removed during surgery, but the caliber of the bullet could not be determined. While

acknowledging that no tests were performed on the victim's hands in an effort to learn whether he had fired a weapon, Dr. Jerry Francisco, who performed the autopsy, explained that the surgery performed on the victim prior to his death would have negated the value of the tests.

J.D. Douglas, a private investigator and former Memphis Police Department homicide detective, testified on behalf of the defendant. It was his opinion that, because Memphis Police had failed to recover all the bullets from the crime scene, it was impossible to ascertain how many guns had been fired at the scene. Of course, police found no weapons at all. The bullet fragments recovered from the victim's body were too small to identify or match to a particular weapon. It was Douglas' opinion that gunshot residue tests, specifically the neutron-activation or atomic-absorption test, should have been performed to determine who had fired a weapon. He conceded, however, that neither test could be used to link a specific individual to a specific gun.

Dr. O.C. Smith, an expert in forensic firearms investigation, testified for the state in rebuttal. Dr. Smith explained that atomic-absorption analysis and neutron-activation analysis are widely different tests. He testified that when many shots are fired in a confined space, such as an apartment, enough gun smoke will be generated to leave gunshot residue on anyone present. It was his opinion that testing for gunshot residue would not have been helpful in this case. He explained that gunshot residue materials can be picked up from a variety of very common sources, such as car batteries. Dr. Smith stated that both false negatives and false positives are common with gunshot residue tests because the residue is easily transferred and removed. He added that his laboratory never performed gunshot residue testing when the victim has undergone significant medical intervention before death.

# I

The defendant contends that the evidence is insufficient to support his convictions for the first degree murder of the victim, the aggravated robbery of Cobb, and the attempted first degree murder of Cobb and Carl Turner. On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain the verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

The defendant was convicted of both first degree premeditated murder and felony murder for the death of the victim. At the time of the offense, first degree murder was defined as follows:

(a) First degree murder is:

(1) An intentional, deliberate, and premeditated killing of another; or

(2) A reckless killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping or aircraft piracy; or

(3) A reckless killing of another committed as a result of the unlawful throwing, placing or discharging of a destructive device or bomb; or

(4) A reckless killing of a child less than sixteen (16) years of age, if the child's death resulted from aggravated child abuse, as defined in § 39-15-402, committed by the defendant against the child.

Tenn. Code Ann. § 39-13-202(a) (1994). Thus, the state was required to prove that the defendant acted, after premeditation and deliberation, with the intent to kill or, in the alternative, that the defendant killed the victim during the course of a robbery.

While the state was required to prove that the defendant intended to kill, it was not required to prove that he intended to kill a particular person. The definition of "intentional" requires that the state prove only that the defendant intended to kill a person, meaning that the defendant had a "conscious objective or desire to . . . cause the result." See Millen v. State, 988 S.W.2d 164, 165 (Tenn. 1999); see also Tenn. Code Ann. § 39-11-302(a) (1991). If the evidence establishes that the defendant intended to cause the death of a person, and did so with premeditation and deliberation, then the result is first degree murder. Millen, 988 S.W.2d at 168.

The elements of first degree murder are questions for the jury and may be inferred from the manner and circumstances of the killing. State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993). Our supreme court has enumerated several circumstances from which the jury may infer premeditation and deliberation, including the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, declarations by the defendant of his intent to kill the victim, and the making of preparations before the killing for the purpose of concealing the crime. See State v. Brown, 836 S.W.2d 530, 541-42 (Tenn. 1992). This court has also ruled that the jury may infer the two elements from planning activity by the defendant before the killing, evidence concerning the defendant's motive, and the nature of the killing. State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995). Moreover, "calmness immediately following a killing is evidence of a cool, dispassionate, premeditated murder." State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Finally, immediate concealment of the crime may indicate the absence of passion. Id.

The testimony at trial established that the defendant and Nesbitt possessed guns and fired several shots in the direction of the unarmed occupants of the Turners' apartment. There was evidence of an armed lookout and getaway car driver waiting in the parking lot at the time of the shooting. This suggests advanced planning of the crime. Barbara Turner saw a calm Nesbitt standing over the fallen victim taking money from the floor. While the defense established that Carl Turner had heard that a man named Sean had retrieved his gun and fired at Nesbitt, Turner explained that he had not seen Sean in possession of a weapon and had based his comment on hearsay from

a man identified as "Nausea." Neither Sean nor "Nausea" testified at the trial.[2] All other witnesses claimed that only the defendant and Nesbitt were armed and fired shots. The testimony also established that, when they were arrested shortly after the shooting, both the defendant and Nesbitt were wearing different clothes than they wore while at the apartment. In addition, no weapons were found in the car, indicating that the weapons had been disposed of after the shooting. When the defendants were stopped by officers a short time later, Nesbitt was driving the car. The jury rejected the defense theory that any other individual could have fired the fatal shot, as was their prerogative. In our view, the evidence was sufficient to support convictions for both felony murder and premeditated murder.

The trial court did not enter a judgment on each murder verdict; instead it merged the two verdicts and entered one judgment of guilt as to first degree murder. As a matter of procedure, we observe that the trial court did not note on the judgment that the defendant's two first degree murder convictions were merged, as suggested by this court in September, 1999, after the defendant's trial:

> In a case involving a single killing where the jury has found the defendant guilty under both theories of first degree premeditated murder and felony murder, the trial court should accept both verdicts but enter only one judgment of conviction, thereby merging the two verdicts. The single judgment of conviction should note the merger of the two counts returned by the jury.
>
> \* \* \*
>
> In situations such as this, the appropriate procedure is for the trial court to specifically note the merger of two convictions of first degree murder in one judgment . . . reflecting a conviction of first degree murder.

State v. Redonna T. Hanna, No. 02C01-9806-CR-00165 (Tenn. Crim. App. at Jackson, Sept. 7, 1999). Accordingly, the judgment of first degree murder entered by the trial court is modified to show that the defendant's convictions for premeditated murder and felony murder were merged into one judgment.

The defendant was also convicted of the attempted first degree murder of Aaron Cobb and Carl Turner. Criminal attempt is defined as follows:

> (a)    A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

---

[2]It appears from the record that Sean, who was also known as "Four-Four," was actually an individual named Dedrick Adams. Dedrick Adams died in a car accident before the trial. "Nausea's" true identity, however, is not clear from the record.

(1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a). As noted above, the evidence showed that the armed defendant entered Carl Turner's residence uninvited, demanded money and valuables, and then began to fire his gun in the direction of those present, including Aaron Cobb and Carl Turner. A driver who had a gun was in a getaway car parked nearby. In our view, the evidence is sufficient to support the defendant's convictions for attempted first degree murder.

Finally, the defendant was convicted of the aggravated robbery of Aaron Cobb. Aggravated robbery is a robbery accomplished by the use of a deadly weapon or where the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-402(a). A robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). Here, the defendant fired a gun in the direction of Aaron Cobb while demanding that he "drop it off." Witnesses testified that "drop it off" was an order to place their money and valuables on the floor. Under these circumstances, the evidence was sufficient to support the defendant's conviction for aggravated robbery.

## II

The defendant next contends that the trial court erred by failing to instruct the jury on the lesser included offenses of felony murder and on the effect of his voluntary intoxication. Neither issue was raised in the motion for new trial. Generally, the failure to present an issue in a motion for new trial results in waiver. Rule 3(e) of the Tennessee Rules of Appellate Procedure provides that for appeals "in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived." Whether properly assigned or not, however, this court may consider plain error upon the record under Rule 52(b) of the Tennessee Rules of Criminal Procedure. State v. Ogle, 666 S.W.2d 58 (Tenn. 1984).

Before an error may be so recognized, it must be "plain" and must affect a "substantial right" of the accused. The word "plain" is synonymous with "clear" or equivalently "obvious." United States v. Olano, 507 U.S. 725, 732 (1993). Plain error is not merely error that is conspicuous, but especially egregious error that strikes at the fairness, integrity, or public reputation of judicial proceedings. See State v. Wooden, 658 S.W.2d 553, 559 (Tenn. Crim. App. 1983). In State v.

Adkisson, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994), this court defined "substantial right" as a right of "fundamental proportions in the indictment process, a right to the proof of every element of the offense and . . . constitutional in nature." In that case, this court established five factors to be applied in determining whether an error is plain:

(a) The record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused [must not have waived] the issue for tactical reasons; and
(e) consideration of the error must be "necessary to do substantial justice.

Id. at 641-42. Our supreme court characterized the Adkisson test as a "clear and meaningful standard" and emphasized that each of the five factors must be present before an error qualifies as plain error. State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000).

With regard to jury instructions, the trial court has a duty "to give a complete charge of the law applicable to the facts of a case." State v. Harison, 704 S.W.2d 314, 319 (Tenn. 1986); see also Tenn. R. Crim. P. 30. "[The] defendant has a constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Our law requires that all of the elements of each offense be described and defined in connection with that offense. See State v. Cravens, 764 S.W.2d 754, 756 (Tenn. 1989). Jury instructions must, however, be reviewed in the context of the overall charge rather than in isolation. See Sandstrom v. Montana, 442 U.S. 510 (1979); see also State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). A charge is prejudicial error "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). Erroneous jury instructions require a reversal unless the error is harmless beyond a reasonable doubt. See Welch v. State, 836 S.W.2d 586 (Tenn. Crim. App. 1992).

The defendant complains that the trial court erred by failing to instruct the jury on second degree murder and criminally negligent homicide as lesser included offenses of felony murder. In relation to its instruction on first degree premeditated murder, the trial court instructed the jury on the lesser included offenses of second degree murder, voluntary manslaughter, and reckless homicide. The trial court's instruction on felony murder, however, included only the lesser offense of reckless homicide. In State v. Burns, 6 S.W.3d 453 (Tenn. 1999), our supreme court revised the standards for the determination of lesser included offenses. Under the formula established by Burns, reckless homicide and criminally negligent homicide would have been lesser included offenses of felony murder as it existed in 1995. See also State v. Ely, 48 S.W.3d 710 (Tenn. 2001). The 1995 statute, under which the defendant was tried, however, required the state to prove that the defendant acted with the "reckless" mental state. In consequence, second degree murder, which required a showing of the "knowing" mental state, would not have been a lesser included offense of felony murder as it existed in 1995. See State v. Gilliam, 901 S.W.2d 385, 390-91 (Tenn. Crim. App. 1995).

Our next inquiry is whether the evidence justified an instruction on criminally negligent homicide. <u>Burns</u>, 6 S.W.3d at 467. The guiding principle is that if there is evidence in the record from which the jury could conclude that a lesser included offense was committed, there must be an instruction for the lesser offense. <u>See</u> <u>Johnson v. State</u>, 531 S.W.2d 558, 559 (Tenn. 1975). In our view, the evidence satisfies both prongs of the <u>Burns</u> test and would have warranted a jury instruction on criminally negligent homicide.

Because the evidence supported an instruction on criminally negligent homicide, the trial court erred by omitting that instruction. The trial court also erred by failing to include an instruction on criminally negligent homicide as a lesser included offense of first degree premeditated murder. In our view, however, the errors were harmless beyond a reasonable doubt. Recently, in <u>State v. Allen</u>, our supreme confirmed that "[a]n erroneous failure to give a lesser-included offense instruction will result in reversal unless a reviewing court concludes beyond a reasonable doubt that the error did not affect the outcome of the trial." ___ S.W.3d ___, No. E1999-00416-SC-R11-CD, (Tenn. Feb. 22, 2002), slip op. at 7. Our high court observed that "[t]he improper omission of a lesser-included offense is analogous to the improper omission of an element of an offense. Omitting an instruction on a lesser included offense denies the jury the option of rejecting a greater offense in favor of a lesser offense." <u>Id.</u> Our supreme court directed that in determining whether the improper omission of a lesser-included offense was harmless beyond a reasonable doubt, "a reviewing court should conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury." <u>Id.</u>, slip op. at 9.

Here, the defendant was convicted of the highest crimes with which he was charged, first degree premeditated murder and felony murder. In reaching a verdict for first degree premeditated murder, the jury rejected the lesser included offenses of second degree murder and reckless homicide. Criminally negligent homicide is an even lesser offense. The jury, therefore, was presented with and declined to exercise the option of convicting on either one of two intermediate offenses. In our view, the jury refused to accept the defense theory that the fatal shots were fired by someone other than the defendant and an instruction on criminally negligent homicide would not have changed the result. With regard to the conviction for felony murder, the jury rejected the intermediate lesser included offense of reckless homicide. Again, criminally negligent homicide is an even lesser offense. Most importantly, the proof was overwhelming that the defendant and his companion, during the commission of a robbery, fired several shots, killing the victim in the process. While the state's evidence necessarily encompassed criminally negligent homicide, thereby justifying an instruction, evidence that the killing was the result of negligence, criminal or otherwise was marginal at best. Under these circumstances, it is our view that the error was harmless beyond a reasonable doubt. <u>See</u> <u>Allen</u>, ___S.W.3d at ___, slip op. at 8; <u>State v. Williams</u>, 977 S.W.2d 101 (Tenn. 1998).

Because the trial court's failure to instruct the jury on these lesser included offenses was harmless beyond a reasonable doubt, no substantial rights of the defendant were affected. Thus, the error does not qualify as "plain." <u>See</u> <u>Adkisson</u>, 899 S.W.2d 641-42.

The defendant also complains that the trial court erred by failing to instruct the jury with regard to the effects of his voluntary intoxication. Our Code provides that while voluntary intoxication is not a defense to prosecution for an offense, evidence of such intoxication may be admitted to negate a culpable mental state. See Tenn. Code Ann. § 39-11-503(a); see also State v. Phipps, 883 S.W.2d 138, 148 (Tenn. Crim. App. 1994). In Harrell v. State, this court set forth the rule as to when the proof requires a voluntary intoxication instruction:

> Proof of intoxication alone is not a defense to a charge of committing a specific intent crime nor does it entitle an accused to jury instructions . . .; there must be evidence that the intoxication deprived the accused of the mental capacity to form specific intent. . . . The determinative question is not whether the accused was intoxicated, but what was his mental capacity.

593 S.W.2d 664, 672 (Tenn. Crim. App. 1979). To support his argument that an instruction on voluntary intoxication was required, the defendant points to Carl Turner's testimony that he appeared to be under the influence of cocaine. While the issue may have been fairly raised, the defendant did not request the instruction and, as indicated, did not include the issue as grounds in his motion for new trial. This particular omission does not, in our view, qualify as especially egregious, "striking at the fairness or integrity" of the proceeding. The right to such an instruction, in these circumstances, was not so substantial that its omission can be considered as plain error. See Adkisson, 899 S.W.2d 641-42.

Accordingly, the judgments of the trial court are affirmed.

_____
GARY R. WADE, PRESIDING JUDGE

-10-